**RECORD NOS. 10-7073(L); 10-7078**

ORAL ARGUMENT PREVIOUSLY HELD ON MAY 10, 2011

In The

# United States Court of Appeals

## For The District of Columbia Circuit

# MARY KATE BREEDEN,

*Plaintiff – Appellant/Cross–Appellee,*

**v.**

# NOVARTIS PHARMACEUTICALS CORPORATION,

*Defendant – Appellee/Cross–Appellant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

## PETITION FOR PANEL REHEARING
## AND FOR REHEARING *EN BANC*

_____

R. Scott Oswald
Adam Augustine Carter
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, NW, Suite 900
Washington, DC  20006
(202) 261-2803

*Counsel for Appellant/Cross-Appellee*

THE LEX GROUP^DC  ♦  1825 K Street, N.W.  ♦  Suite 103  ♦  Washington, D.C.  20006
(202) 955-0001  ♦  (800) 815-3791  ♦  Fax: (202) 955-0022  ♦  www.thelexgroupdc.com

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS...........................................................................................i

TABLE OF AUTHORITIES ................................................................................ ii

APPELLANT'S PETITION FOR PANEL REHEARING
AND FOR REHEARING *EN BANC*........................................................................1

STATEMENT OF PURPOSE PURSUANT TO
FED. R. APP. P. 35(b)(1) AND LOCAL RULE 35(b)(1) ......................................1

FACTUAL BACKGROUND................................................................................1

ARGUMENT FOR REHEARING .........................................................................2

     I.     REVIEW OF THE PANEL'S DECISION IS NECESSARY TO
         ADDRESS AN ISSUE OF EXCEPTIONAL IMPORTANCE............2

         A.    Breeden Did Not Forfeit Her Claim to Equitable Relief ............2

         B.    The FMLA Entitles Victims of Retaliation to Equitable
              Relief in Addition to Monetary Damages...................................4

     II.    PROXIMATE CAUSATION IS IN THE PROVINCE OF THE
         JURY ........................................................................................................8

     III.   THE PANEL'S DECISION CONTRADICTS THIS
         CIRCUIT'S RULING IN *PARDO-KRONEMANN v.*
         *DONOVAN* PERTAINING TO AN EQUIVALENT POSITION......12

CONCLUSION ....................................................................................................15

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)........................................................................9

*Boodoo v. Cary*,
   21 F.3d 1157 (D.C. Cir. 1994)................................................8, 12

*Breeden v. Novartis Pharm. Corp.*,
   2011 WL 2652432 (D.C. Cir. July 8, 2011)........................2, 6, 9, 10, 12, 13

*\*Colburn v. Parker Hannifin/Nichols Portland Div.*,
   429 F.3d 325 (1st Cir. 2005)....................................................5, 6

*Exxon Co., U.S.A. v. Sofec, Inc.*,
   517 U.S. 830 (1996)........................................................................8

*Gleklen v. Democratic Cong. Campaign Comm., Inc.*,
   199 F.3d 1365 (D.C. Cir. 2000)....................................................7

*Hemi Group, LLC v. City of New York*,
   130 S. Ct. 983 (2010)....................................................................11

*\*Hicks v. United States*,
   511 F.2d 407 (D.C. Cir. 1975)......................................................8

*Keeffe v. Library of Cong.*,
   777 F.2d 1573 (D.C. Cir. 1985)....................................................5

*\*Pardo-Kronemann v. Donovan*,
   601 F.3d 599 (D.C. Cir. 2010)....................................9, 12, 13, 15

*\* Denotes Authorities Upon Which We Chiefly Rely*

*Ragsdale v. Wolverine World Wide, Inc.*,
     535 U.S. 81 (2002)............................................................................5

*Roseboro v. Billington*,
     606 F. Supp. 2d 104 (D.D.C. 2009)...............................................5, 7

*\*Staub v. Proctor Hosp.*,
     131 S. Ct. 1186 (2011).............................................................10, 11

*Woodruff v. Peters*,
     482 F.3d 521 (D.C. Cir. 2007).................................................... 2-3

*Yee v. City of Escondido, Cal.*,
     503 U.S. 519 (1992)..........................................................................3

## Federal Statutes

29 U.S.C. § 2614(a)(1)......................................................................12

29 U.S.C. § 2615...........................................................................6, 7

29 U.S.C. § 2615(a)(1)........................................................................7

*29 U.S.C. § 2617(a)(1)(A)..........................................................4, 6, 7

*29 U.S.C. § 2617(a)(1)(B)..........................................................4, 6, 7

## Federal Regulations

29 C.F.R. § 825.215(a)................................................................12, 13

## Federal Rules

D.C. Cir. L.R. 35(b)(1).......................................................................1

Fed. R. App. P. 35..............................................................................1

Fed. R. App. P. 35(a)(2).......................................................................2

Fed. R. App. P. 35(b)(1).............................................................................................1

Fed. R. App. P. 40 ....................................................................................................1

## APPELLANT'S PETITION FOR PANEL REHEARING
## AND FOR REHEARING *EN BANC*

Pursuant to Rules 35 and 40 of the Federal Rules of Appellate Procedure, Appellant Mary Kate Breeden ("Appellant" or "Breeden") petitions for rehearing of the decision by the Panel on July 8, 2011, or in the alternative, petitions for rehearing *en banc*.

## STATEMENT OF PURPOSE
## PURSUANT TO FED. R. APP. P. 35(b)(1) AND LOCAL RULE 35(b)(1)

The Panel's decision misconstrues the equitable remedies available to victims of discrimination and retaliation under the Family and Medical Leave Act ("FMLA"), and as such is an issue of exceptional importance.  In addition, the Panel's decision disrupts the uniformity of both Supreme Court and this Circuit's precedent construing the application of proximate causation in employment discrimination cases and the proper role of the fact-finder in determining proximate causation.  Finally, the Panel's decision is in conflict with a recent decision of this Circuit about the proper role of the jury in deciding the equivalence of two jobs.

## FACTUAL BACKGROUND

Breeden provided an extensive factual background in her opening brief which is incorporated here by this reference. *See* Br. of Appellant at 6–15.  The Panel's recitation of the facts was not taken in the light most favorable to Breeden, and ignores entirely the fact that Breeden had not been assigned to the large Tier I

1

transplant hospitals (the University of Maryland and Johns Hopkins) that are at the center of this case for many months before they were stripped from her territory in what the jury found was retaliation for Breeden announcing her need for FMLA leave.  In short, she was not given adequate time to be successful in these accounts.

**ARGUMENT FOR REHEARING**

**I.    REVIEW OF THE PANEL'S DECISION IS NECESSARY TO ADDRESS AN ISSUE OF EXCEPTIONAL IMPORTANCE._____**

The Panel's holding creates a dilemma of exceptional importance with regard to the remedies available to victims of retaliation.  *See* Fed. R. App. P. 35(a)(2).  The Panel dismissed Breeden's argument that equitable relief is available to victims of retaliation immediately upon a violation of the FMLA.  *See Breeden v. Novartis Pharm. Corp.*, 2011 WL 2652432 at *21-22 (D.C. Cir. July 8, 2011). The Panel's holding rests upon two premises that are incorrect.  <u>First</u>, that Breeden raised this issue for the first time on appeal and has therefore forfeited the argument.  <u>Second</u>, that the elements of a retaliation claim were not met and therefore equitable relief is unavailable.

**A.    Breeden Did Not Forfeit Her Claim to Equitable Relief._____**

The Panel concluded that Breeden forfeited the issue of equitable relief because it was not raised in her opposition to Novartis' Rule 50 motion.  *See id*. Breeden has not forfeited this issue because the issue was pervasively briefed and discussed in the District Court prior to Breeden's appeal.  *See Woodruff v. Peters*,

482 F.3d 521, 525 (D.C. Cir. 2007) ("[O]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.") (quoting *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 534 (1992)).

The issue of equitable relief was briefed and examined thoroughly in the District Court. On March 1, 2010, the District Court acknowledged that equitable relief was for the Court to decide -- the record shows:

> MR. OSWALD: Your Honor, he is -- first off, just in terms of the construct, we concede that there are two parts to the damages hearing. One is before you, and you asked this question specifically during our pre-trial, what damages were for the jury and what were for the Court. The back pay, consistent with statute, is for the jury, and the reinstatement or in the alternative front pay, if the Court finds that reinstatement is impracticable, is for the Court.
> THE COURT: I got that, but mitigation works both ways.

J.A. at 554 (Transcript of Jury Trial Proceedings on March 1, 2003). Also, prior to March 1, 2010, Novartis agreed that equitable relief was for the Court to decide.

> MR. GELB: I think reinstatement and front pay is an equitable remedy that would be left to the Court, as I understand it.
> THE COURT: But economic damages up to the point of trial, you concede are for the jury?
> MR. GELB: I'm not prepared to concede that. I haven't specifically looked at that yet, but…"
> THE COURT: You're not to rule on that. Okay. Well neither am I.

3

*Id.* at 464 (Transcript of Pretrial Conference on February 18, 2010). Finally, on March 19, 2010, Breeden filed a Bench Memorandum Regarding Equitable Relief in the Form of Reinstatement or, in the Alternative, Front Pay. *See* Dkt. No. 75. Also, Novartis filed its Memorandum in Opposition to Front Pay Damages on the same day. *See* Dkt. No. 76.

When Novartis filed its Rule 50 motion, it focused on the causal connection between the retaliation and the ensuing economic damages. *See* Dkt. No. 78. The District Court issued its opinion in Novartis' favor, declared all other motions moot, and Judge Robertson retired the next day. This left the briefing related to equitable relief, including Breeden's Bench Memorandum, in limbo, and therefore made it impossible for Breeden to dispute the issue of equitable relief until her appeal. Contrary to the Panel's holding, the issue was properly raised below.

### B.    The FMLA Entitles Victims of Retaliation to Equitable Relief in Addition to Monetary Damages.

The Panel's decision dismissing the availability of equitable relief for Breeden runs counter to the plain language of the FMLA. The statute explicitly provides two avenues of relief for victims of discrimination and retaliation -- monetary damages measured by loss in compensation or benefits, and a separate remedy of equitable relief. *See* 29 U.S.C. §§ 2617(a)(1)(A) & (B). If the Panel's ruling were to stand, victims of retaliation will ***always*** be left without a remedy unless monetary damages can also be shown. Yet Congress contemplated

4

that victims of retaliation can suffer harm other than monetary damages and therefore provided equitable relief as an additional, and entirely separate, remedy.

The Supreme Court has held in order to succeed with a claim of retaliation under the FMLA, a plaintiff must suffer some form of prejudice as a result of the violation. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). Breeden does not dispute that some prejudice must be shown. However, a victim of retaliation can suffer prejudice by being denied positions that will likely lead to promotion, career development, and job security, as was the case with Breeden, but not suffer immediately recognizable (or proximate) economic damages. *See*, *e.g.*, *Roseboro v. Billington*, 606 F. Supp. 2d 104, 113 (D.D.C. 2009) (finding equitable relief necessary to expunge employment records even though plaintiff could not show loss of benefits or loss of compensation) (citing *Keeffe v. Library of Cong.*, 777 F.2d 1573, 1577, 1583 (D.C. Cir. 1985) (affirming district court's equitable order to expunge personnel records)). As Breeden has argued, such actions satisfy the Supreme Court's requirement in *Ragsdale* that the employee must be "prejudiced" by the violation of the FMLA. *See* Br. of Appellant at 9. The FMLA should not, and in fact does not, leave such victims unprotected.

Indeed, the First Circuit has said as much in *Colburn v. Parker Hannifin/Nichols Portland Div.*, 439 F.3d 325 (1st Cir. 2005). The Panel dismissed the First Circuit's reasoning in *Colburn* by focusing narrowly on the

language in footnote 6 in which the First Circuit's hypothetical plaintiff suffers a retaliatory firing. *See Breeden*, 2011 WL 2652432 at *22 n. 7. In *Colburn*, the First Circuit stated that the plaintiff had suffered no lost income and offered no evidence of a loss of benefits. *See Colburn*, 429 F.3d at 334. It said:

> Damages, however, are not the only remedy available under the FMLA. The FMLA also provides for equitable relief, including reinstatement . . . thus, a hypothetical plaintiff who proved retaliation could be reinstated once he or she is able to perform all essential functions of the position . . . even if he or she had no monetary damages.

*Id.* The Panel's dismissal of the First Circuit's reasoning is erroneous because a retaliatory firing is not required to trigger equitable relief. *See id.* All that is required is proof of retaliation, *see id.*, of which Breeden provided ample evidence.

The Panel presumed that because the District Court negated the jury's finding that Breeden suffered economic damages by reason of Novartis' retaliation, all liability for Novartis' retaliation evaporated. *See Breeden*, 2011 WL 2652432 at *22. This is simply incorrect. Liability does not rest on a showing of lost compensation or benefits. The statutory language referring to compensation and benefits "lost *by reason of* the violation" is found wholly under § 2617(a)(1)(A). The loss of compensation or benefits is not an element of an FMLA violation. Rather, it is a requirement for monetary damages. The equitable remedy available under § 2617(a)(1)(B) stands separate and apart from § 2617(a)(1)(A)'s requirement. Equitable relief requires only a violation of § 2615. Indeed, relief

6

must be provided if there is a violation because the statutory language is not permissive. The FMLA unequivocally states that: "Any employer who violates section 2615 of this title ***shall be liable*** to any eligible employee affected …." § 2615(a)(1) (emphasis added).

A violation of § 2615 requires that a plaintiff "show that she engaged in a protected activity under [the FMLA]; that she was adversely affected by an employment decision; and that the protected activity and the adverse employment action were causally connected." *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1368 (D.C. Cir. 2000). The so called fourth element referred to by Novartis and the Panel, that of a loss of compensation or benefits, is not relevant to a violation and no such fourth element is required for equitable relief. *See Roseboro*, 606 F. Supp. 2d at 113. Here, the jury determined that the three elements of a retaliation claim had been met, and as such the District Court was required to exercise its equitable powers.

If the Panel's decision were to stand, §§ 2617(a)(1)(A) & (B) would merge, cutting off an entire avenue of relief contrary to the plain meaning of the statute. Because an employee might experience retaliation separate from a loss of compensation or benefits, an employer must not be allowed to retaliate against an employee for exercising a statutory right, and then evade liability because monetary damages may not be available under § 2617(a)(1)(A). The language of

7

the FMLA empowers courts to protect victims of retaliation regardless of any

monetary loss. Because the Panel's opinion limits a victim's relief and ties the

hands of courts to provide equitable relief contrary to the plain language of the

FMLA, this raises an issue of exceptional importance and the Panel's opinion

should be reviewed.

## II.  PROXIMATE CAUSATION IS IN THE PROVINCE OF THE JURY.

The Panel contradicts this Circuit's and Supreme Court precedent by taking

the issue of proximate causation out of the hands of the jury. This Circuit is clear

that proximate causation requires a factual determination and is left to the jury.

*See Boodoo v. Cary*, 21 F.3d 1157, 1161 (D.C. Cir. 1994) (judgment as matter of

law is highly disfavored). Indeed, the standard that this Court has declared for

taking a verdict out of the hands of a jury is that it must be "*absolutely clear* that

the [defendant's wrongful act] could *not* have been a proximate cause [of the

harm]." *See id.* (emphasis added). This Circuit was unequivocal when it stated

that proximate causation "is to be determined as a fact. . . ." *Hicks v. United States*,

511 F.2d 407, 420 (D.C. Cir. 1975); *see also Exxon Co., U.S.A. v. Sofec, Inc.*, 517

U.S. 830, 840-41 (1996) (proximate cause and intervening events are left to

factfinder "subject to limited review"). Since this Circuit's standard is that

absolute clarity is necessary for a verdict to be taken from the jury and that

8

proximate cause is reserved for the fact finder, the Panel's decision contradicts controlling precedent.

The Panel likewise weighed the evidence and drew inferences against Breeden as demonstrated by its reliance on Breeden's performance at Johns Hopkins and UMD, which is once again contrary to controlling precedent. *See Pardo-Kronemann v. Donovan*, 601 F.3d 599, 601 (D.C. Cir. 2010) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts *are jury functions*, not those of a judge.") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (emphasis added)).

Breeden was assigned Johns Hopkins and UMD in July 2003 and it was announced that they would be taken from her in or about November 2004. *See* J.A. at 291, 294-98. She therefore had only approximately 17 months to lay ground work and cultivate the necessary relationships successfully to service these accounts. The Panel even acknowledged that being successful at transplant centers takes time when it noted that Breeden was, *after three years*, able to score an initial victory with the University of Virginia, a previously closed door. *See Breeden*, 2011 WL 2652432 at *12. To determine that Breeden was not successfully servicing these large accounts, and therefore that her termination was not foreseeable after losing them, required the Panel to draw factual inferences against Breeden, which it must not and cannot do.

9

The Panel's error regarding proximate causation is made more evident in light of the Supreme Court's recent decision in *Staub v. Proctor Hospital*, 131 S. Ct. 1186 (2011). In *Staub*, the plaintiff argued that his immediate supervisors fabricated an incident of insubordination out of discriminatory animus for the plaintiff's military reserve service. *See id.* at 1190-91. Later, a manager acting without discriminatory animus reviewed the plaintiff's file and terminated the plaintiff based on the fabricated incident of insubordination. *See id.* Justice Scalia, writing for the Court, reasoned that the introduction of a new manager acting without animus was not sufficient to sever the causal chain. *See id.* at 1192-93.

The Panel, like the District Court, placed great emphasis on the introduction of Jesus Leal ("Leal") and a new outside consultant, Powell & Associates, to determine that any causal connection between Novartis' retaliation and Breeden's later economic damages was severed. *See Breeden*, 2011 WL 2652432 at *17-18. Yet, the Supreme Court was unequivocal that intervening managers do not sever the causal chain for the purposes of proximate causation when earlier actors inflicted the injury. As the Court said: "[I]t is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action …from being the proximate cause of the harm." *Staub*, 131 S. Ct. at 1192. Furthermore, the standard for proximate causation under *Staub* "requires only 'some direct relation between the injury asserted and the injurious conduct alleged'

10

and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'" *Id.* (quoting *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 989 (2010)).

Breeden has met this standard.  Following the holding of *Staub*, the introduction of Leal and Powell & Associates do not sever the causal chain because their decisions were based upon the injury inflicted by O'Callaghan and other agents of Novartis.  Namely, Novartis slashed Breeden's territories placing her in a vulnerable position.  Leal and Powell & Associates simply made the obvious choice of terminating Breeden because of her vulnerable position.  As the introduction of Leal and Powell & Associates does not in and of itself sever the causal chain, all that is left to determine is if there is a direct relation between Breeden's injury (her termination) and the injurious conduct (the retaliatory slashing of her territory).  Breeden provided ample evidence of the direct relation between Novartis' retaliation and her termination upon which a reasonable jury relied.  *See* Br. of Appellant at 41-50; Reply Br. of Appellant at 15-25 (discussing facts that Breeden's termination was solely based on conditions created by retaliation, not for performance or other reasons).

True, the Panel and District Court may weigh the evidence of this direct link differently than the jury did.  Reasonable minds can disagree.  But, based on this Circuit's own standard, a disagreement as to the weight of the evidence is not

11

sufficient to overturn a jury verdict, *see Boodoo*, 21 F.3d at 1161, particularly

when the central justification for encroaching on the province of the jury, *see*

*Breeden*, 2011 WL 2652432 at *17-18, is negated by Supreme Court precedent.

Because the Panel's opinion stands in contrast to both Circuit and Supreme Court

precedent, a Panel or *en banc* rehearing is necessary to resolve the conflicts.

## III.  THE PANEL'S DECISION CONTRADICTS THIS CIRCUIT'S RULING IN *PARDO-KRONEMANN v. DONOVAN* PERTAINING TO AN EQUIVALENT POSITION.

Under the FMLA, an eligible employee who returns from FMLA leave is

entitled to her previous position or a position equivalent in benefits, pay, and other

employment conditions.  *See* § 2614(a)(1).  The Department of Labor ("DOL")

defines an equivalent position as:

> [O]ne that is *virtually identical* to the employee's former position in terms of pay, benefits and working conditions, including privileges, prerequisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.

29 C.F.R. § 825.215(a) (emphasis added).

This Circuit recently examined the question of an "equivalent position" in

*Pardo-Kronemann*, 601 F.3d at 601-02.  While *Pardo* examined retaliation under

the Title VII framework, this Court's reasoning as to whether a new position was

12

an adverse action applies directly to the question of whether two positions are equivalent under the FMLA regulation: 29 C.F.R. § 825.215(a).

In *Pardo*, this Court overturned the district court's grant of summary judgment in favor of the employer and concluded that despite the fact that the employee's "title, grade, pay, and benefits remained the same," the employer was not entitled to summary judgment. *See Pardo-Kronemann*, 601 F.3d at 607. This Court concluded that it is the role of the factfinder to "compare the position the plaintiff held before the transfer to the one the plaintiff holds afterwards[,] and that'[t]he court *may not take that question away from the jury if a reasonable juror could find that the reassignment left the plaintiff with significantly diminished responsibilities*." *Id.* at 601-602 (emphasis added) (internal citations omitted).

Just as in *Pardo*, Breeden's new position was not equivalent, although her title, grade, pay and benefits remained the same. After recognizing opportunity for advancement as a material difference in positions, the Panel reasoned that because Breeden increased in sales rank after the realignment, her opportunities for advancement within Novartis were not restricted. *Breeden*, 2011 WL 2652432 at *13. The Panel placed great weight on Breeden's poor sales ranking prior to the realignment, and described her as "hardly a rising star." *Id.* When viewed in their entirety and in the light most favorable, Breeden's performance reviews contradict the Panel's conclusion. In her 2003 report, Breeden's manager wrote:

13

> You have built a strong base of relationships with your *key customers* and centers and have built strong perceptions of Novartis' service to your *key customers*. Winning the good favor of tough to please …is a solid achievement.

J.A. at 1280. (emphasis added).

Breeden's performance review in 2004 was even more indicative of her opportunities to advance.  Among her key strengths, TBU's Executive Director of Managed Care and Government Policy, John Zieger, wrote: "Many centers that were not Novartis friendly in past years in this territory have come back to work w/us [sic]…" J.A. at 1292.

Breeden's 2003 and 2004 performance reviews confirm that she exhibited leadership in her pre-realignment position, grew her reputation, and re-took ground lost to competitors with key customers – the same key customers that were then stripped from Breeden during the realignment.  At the very least, this shows a factual dispute as to the opportunities for advancement inherent in the two positions.  The Panel improperly weighed the evidence surrounding Breeden's performance, determined that she was "hardly a shining star," and concluded that she therefore would not have been eligible for advancement within Novartis.

By concluding that Breeden's position was equivalent despite significant evidence to the contrary, the District Court invaded the rightful province of the jury, and by reaching the same conclusion, the Panel's decision conflicts with this

14

Court's opinion in *Pardo-Kronemann*.  Therefore, a Panel rehearing or a full

rehearing *en banc* is necessary to resolve this irreconcilable contradiction within

the D.C. Circuit.

## **CONCLUSION**

WHEREFORE, and for all the aforementioned reasons, Breeden respectfully

petitions for a rehearing of the Panel's decision or, in the alternative, a rehearing in

*en banc*.

Respectfully submitted,

/s/ Adam Augustine Carter
R. Scott Oswald, DC Bar No. 458859
Adam Augustine Carter, DC Bar No. 437381
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835 (facsimile)
Counsel for Appellant

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 8th day of August, 2011, I caused this Petition for

Panel Rehearing and for Rehearing *En Banc* to be filed electronically with the

Clerk of the Court using the CM/ECF System, which will send notice of such filing

to the following registered CM/ECF users:

Catherine E. Stetson
Jessica L. Ellsworth
HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, DC  20004
(202) 637-5600

*Counsel for Appellee/Cross-Appellant*

Stephen Z. Chertkof
HELLER, HURON, CHERTKOF, LERNER
  SIMON & SALZMAN, PLLC
1730 M Street, NW, Suite 412
Washington, DC  20036
(202) 293-8090

*Counsel for Amicus*
  *National Employment*
  *Lawyers Association*

Melvin Radowitz
AARP FOUNDATION
601 E Street, NW
Washington, DC  20049
(202) 434-2060

*Counsel for Amicus*
  *AARP*

Aaron R. Gelb
Mark L. Stolzenburg
VEDDER PRICE, PC
222 North LaSalle Street
Chicago, Illinois  60601
(312) 609-7500

*Counsel for Appellee/Cross-Appellant*

Sally Jean Dworak-Fisher
PUBLIC JUSTICE CENTER
One North Charles Street, Suite 200
Baltimore, Maryland  21202
(410) 625-9409

*Counsel for Amici Public Justice Center,*
  *National Partnership for*
  *Women & Families, and*
  *Equal Rights Advocates*

Daniel B. Kohrman
AARP FOUNDATION
601 E Street, NW, Room A4-240
Washington, DC  20049
(202) 434-2064

*Counsel for Amici*
  *National Employment Lawyers*
  *Association and AARP*

Rachel Goldberg
U.S. DEPARTMENT OF LABOR
Office of the Solicitor
200 Constitution Avenue, NW, Room N2716
Washington, DC  20210
(2020) 693-5556

*Counsel for Amicus*
  *Secretary of Labor*

I further certify that on this 8th day of August, 2011, I caused the required

number of bound copies of the Petition for Panel Rehearing and for Rehearing *En*

*Banc* to be hand-filed with the Clerk of the Court.


/s/ Adam Augustine Carter
*Counsel for Appellant*

# **ADDENDUM**

## <u>ADDENDUM TABLE OF CONTENTS</u>

**<u>Page</u>**

Opinion of
The United States Court of Appeals for the
District of Columbia Circuit
            entered July 8, 2011 ...............................................................................Add. 1

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 10, 2011　　　　　　　Decided July 8, 2011

No. 10-7073

MARY KATE BREEDEN,
APPELLANT

v.

NOVARTIS PHARMACEUTICALS CORPORATION,
APPELLEE

———

Consolidated with 10-7078

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-00625)

———

*Adam Augustine Carter* argued the cause for the appellant/cross appellee. *R. Scott Oswald* was on brief.

*Sally Dworak-Fisher* was on brief for *amici curiae* Public Justice Center, National Partnership for Women & Families and Equal Rights Advocates in support of the appellant.

*Daniel B. Kohrman* and *Melvin Radowitz* were on brief for *amici curiae* National Employment Lawyers Association and AARP in support of the cross-appellee. *Stephen Z. Chertkof* entered an appearance.

2

*Rachel Goldberg*, Attorney, United States Department of Labor, argued the cause for *amicus curiae* Secretary of Labor in support of the appellant.

*Catherine E. Stetson* argued the cause for the appellee/cross appellant. *Jessica L. Ellsworth* was on brief. *Aaron R. Gelb*, *David M. Hernandez* and *Mark L. Stolzenburg* entered appearances.

Before: HENDERSON, BROWN and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LeCRAFT HENDERSON, *Circuit Judge*: Mary Breeden (Breeden) sued her former employer Novartis Pharmaceuticals Corporation (Novartis) alleging violations of the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601 *et seq.* The district court granted summary judgment in favor of Novartis on Breeden's interference claim and entered a judgment as a matter of law on her retaliation claim. Breeden appeals both the summary judgment and the judgment as a matter of law. Novartis conditionally cross-appeals the district court's mixed-motive jury instruction, arguing that the FMLA does not permit a mixed-motive claim. For the following reasons, we affirm the district court in full and do not reach Novartis's conditional cross-appeal.

## I.

Novartis hired Breeden in 2000 as an Associate Transplant Specialist in its Transplant Business Unit (TBU). Her title later changed to Transplant Account Manager (TAM) but her job remained the same. The TBU sells products designed to help prevent an organ transplant recipient's body from rejecting the new organ. As a TAM, Breeden's job was to persuade doctors and hospitals to use Novartis products.

3

TBU management restructured the sales force in 2003 to focus more closely on the medical centers performing the most organ transplants and thus having the greatest influence in the prescription of transplant drugs. As part of the restructuring, Novartis transferred three of Breeden's Virginia accounts to another TAM—Ruth Ann Sneith (Sneith)—and gave Breeden three new accounts—Johns Hopkins and the University of Maryland, both in Baltimore, Maryland, and the Alfred I. duPont Children's Hospital in Wilmington, Delaware. Breeden was "thrilled" with the realignment because she viewed Johns Hopkins and the University of Maryland as "great centers." Breeden Dep. 38-39. Despite her excitement with the 2003 realignment, her performance did not improve. She was the 25th-rated TBU sales representative—out of 26—in 2002. *Id.* at 59. In 2003, she was the lowest-rated TBU sales representative—26th out of 26—and received a "below expectations" rating of her sales performance. *Id.* at 59-60; Trial Tr. 104, *Breeden v. Novartis Pharm. Corp.*, 714 F. Supp. 2d 33 (D.D.C. 2010) (*Breeden II*) (No. 08-625 Mar. 1, 2010) (3/1/10 Tr.) (Breeden testimony). In 2004, she was again rated 25th out of 26. 3/1/10 Tr. 102-03 (Breeden testimony).

In June 2004 Brian O'Callaghan (O'Callaghan), then in charge of the TBU, accompanied Breeden on a sales call. Breeden claimed he asked her if she had children, inquired about her fertility treatments and asked if she planned to return to Novartis after having children. O'Callaghan denied asking those questions. According to him, Breeden asked about his children and he responded, with what he believed to be "a normal response" to her question, by asking Breeden if she had any children. O'Callaghan Dep. 18. O'Callaghan claimed Breeden replied that she did not have kids and "insinuated" she could not have kids, at which point he "changed the subject and moved on to a different conversation feeling uncomfortable." *Id.*

4

Shortly thereafter Novartis decided to realign its TBU sales force again and in September 2004 hired the consulting firm ZS Associates (ZS) to develop a new sales model. In November 2004 Breeden informed Novartis she was pregnant and would need FMLA leave beginning in March 2005. ZS presented its realignment proposal to TBU management the next month. During its presentation, ZS discussed "contingency plans," which were intended "to plan for[] something out of the ordinary, like a vacancy that hasn't been filled or a maternity leave or a disability of some kind, or a promotion, for example, in the case of M. Stillwell. He was being promoted so we needed to fill a vacancy." Villageliu Dep. 80.[1] Breeden's upcoming maternity leave was one of the contingency plans discussed at the meeting, as was the upcoming maternity leave of another employee, Kathy Dilger. *Id.* at 80-81, 84-85. The PowerPoint slide that mentioned Breeden's maternity leave read: "M.K. Breeden on MAT leave in 2005: Who can work with her now to learn the accounts and then temporarily cover her key accounts when she [is] out on maternity leave in May/June?" *Id.* at 80. A ZS consultant who worked on the assignment stated that no one gave him any reason to believe Breeden would not return from maternity leave. *Id.* at 81.

ZS placed each account into a tier from I to IV and assigned a "full-time equivalent" (FTE) value to each tier. *Id.* at 96. For example, a Tier I account typically had a FTE value of .2 to .3, meaning the TAM assigned to that account should devote 20% or 30% of his time to that account. ZS tried to divide the accounts so that each TAM had a FTE as close to 1.0 (100%) as possible.

Effective January 1, 2005, TBU management assigned Breeden nine accounts, all located in the Washington, D.C.,

---

[1] Alejandro Villageliu worked on the TBU's 2004/2005 realignment as a ZS consultant. Villageliu Dep. 6-8.

5

area.  Breeden no longer serviced Johns Hopkins or the University of Maryland, both Tier I accounts, or duPont Children's Hospital, a Tier III account.  Her new accounts included one Tier I account, three Tier II accounts, one Tier III account and four Tier IV accounts.  In total, Breeden had a FTE of 1.01.  Breeden claimed that she objected to the realignment during a conference call in which O'Callaghan participated.  According to Breeden, O'Callaghan responded to her objections by "jokingly" saying "well, you're not coming back from maternity leave anyway, right?".  Breeden Dep. 97-101.  O'Callaghan not only denied having made that statement but denied having participated in the conversation at all.  O'Callaghan Dep. 42 (Q: "Did you ever say anything like ['Well, you're not coming back from maternity leave anyway']?" A: "Never."); *id.* at 42-43 ("Me getting into conversations on a teli-con with individual sales representatives would never have happened, and that conversation never happened.").  Breeden further claimed that both O'Callaghan and her immediate supervisor, Tom Harper (Harper), acknowledged she had suffered from the realignment and promised to make her "whole" and to "compensate" her by giving her some of her old accounts back.  Breeden Dep. 126-27, 134-37.  Both O'Callaghan and Harper denied making any such promise.  O'Callaghan Dep. 43; Harper Dep. 19-20.  Sometime in 2005 Harper spoke to Breeden and Sneith about transferring some of Sneith's accounts to Breeden.  Sneith Dep. 21-24.  The record contains a table comparing the number of transplants performed at Sneith's accounts to the number of transplants performed at Breeden's accounts and describing two possible scenarios for transferring accounts from Sneith to Breeden.  Despite the discussion, no change took place.  According to Breeden, Harper told her he would not give her any of Sneith's accounts because Sneith was "single."  Breeden Dep. 158-61.  Harper denied making that statement.

6

Breeden left Novartis on maternity leave in late March 2005. She returned in July 2005, having extended her leave through the use of vacation time and personal days. On her return, she held the exact position she had held when she left on maternity leave in March, with the same title, same salary, same benefits and, significantly, the same accounts. Harper Decl. ¶ 15; Appellant's Br. 52. Breeden then began to distinguish herself in the TBU. Whereas before 2005 she had ranked last or next-to-last of all TBU sales representatives, in 2005 she ranked 14th out of 25. Breeden Dep. 70-71; 3/1/10 Tr. 103. She ranked even higher in 2006—7th out of 25. Breeden Dep. 71-73; 3/1/10 Tr. 103. She and her colleagues in her business area received an award at a national sales meeting in 2006 for working in the top producing business area—a far cry from the "below expectations" rating she had received in 2003. Breeden Dep. 156-57; 3/1/10 Tr. 105. Her compensation also increased—substantially—after the realignment.

O'Callaghan left Novartis in mid-2006 and Novartis hired Jesus Leal (Leal) to replace him as head of the TBU. Leal hired Powell & Associates (Powell) in 2007 to recommend further changes to the TBU sales structure. Among other things, Powell recommended the TBU create a new sales territory covering Indiana and Cincinnati, Ohio. Because the TBU believed it could not afford to hire an additional sales representative, Powell recommended it combine Breeden's and Sneith's territories into one territory and terminate either Breeden or Sneith in order to create a sales position for the new territory in the Midwest. Leal Aff. ¶ 4; Weinberg Decl. ¶ 5. Novartis did not consider Breeden for the new territory. Instead it hired a sales representative who had previously worked for a competitor in that region and who thus had existing relationships with accounts there. Having recently combined territories in non-TBU sales groups, Novartis had developed written rules "on how to combine territories and how [to] choose who is the . . . surviving associate." 3/2/10 Tr. (afternoon) 8-9 (testimony of

7

Michael Barr, Novartis director of human resources). Under its rules, Novartis retained Sneith, who had more accounts and prescriptions in the combined territory (formerly Breeden's and Sneith's separate territories). Novartis informed Breeden it was eliminating her position in January 2008.

Breeden sued Novartis in district court in April 2008, asserting an interference claim and a retaliation claim under the FMLA. Her interference claim alleged that Novartis did not give her a substantially equivalent position when she returned from FMLA leave in July 2005. Her retaliation claim alleged that Novartis realigned her accounts in 2005—and failed to keep its alleged promise to make her "whole"—in retaliation for her FMLA maternity leave. Novartis moved for summary judgment on both claims. On February 16, 2010, the district court granted summary judgment to Novartis on Breeden's interference claim but denied summary judgment on her retaliation claim. *Breeden v. Novartis Pharm. Corp.*, 684 F. Supp. 2d 58, 60-63 (D.D.C. 2010) (*Breeden I*). The district court found that Breeden's post-2005 realignment position was substantially equivalent to her pre-realignment position. Specifically, the court rejected Breeden's assertion that her post-realignment position required less effort or skill than her pre-realignment position because, it concluded, "more effort and skill should be needed to wring more sales from a smaller territory." *Id.* at 61. The court also rejected Breeden's argument that she lost the authority to offer customers discounts by noting that every TAM lost that authority after the realignment. *Id.* The court rejected Breeden's claim that her new account portfolio had less "status" or "prestige" than her previous portfolio, noting that United States Department of Labor regulations specifically exclude "intangible[] or unmeasurable aspects of [a] job" when measuring the equivalence of two positions. *Id.* (quoting 29 C.F.R. § 825.215(f)). Although the court denied summary judgment on Breeden's retaliation claim, it expressed doubt that she would ultimately prevail on the claim. The court identified

8

"proof of damages" as the defect in her retaliation claim, observing that it "may turn out to be insurmountable." *Id.* at 63.

## A. Judgment as a Matter of Law

Breeden's retaliation claim was tried to a jury over three days in March 2010.  At the end of Breeden's case-in-chief, Novartis moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a).  Novartis argued that Breeden failed to show she suffered damages as a result of the alleged retaliation, i.e., the 2005 realignment.  The district court, although "inclined to agree with [Novartis] that the proof of causation of damages is virtually nonexistent," nonetheless decided to submit the question to the jury pursuant to Rule 50(b).[2]  3/2/10 Tr. (afternoon) 33.  The court noted "that the passage of three years, the involvement of a new consultant, the increase in the plaintiff's income after 2005, between 2005 and 2008 . . . interrupt, attenuate and may defeat the chain of causation."  *Id.*

The jury returned a verdict for Breeden on March 5 and awarded her $289,669 in damages.  Novartis moved for judgment as a matter of law or, in the alternative, for a new trial. The district court granted Novartis's motion for judgment as a matter of law on May 26.  *Breeden II*, 714 F. Supp. 2d at 35-37. The court held that the FMLA's requirement that an employee suffer damages "by reason of" the FMLA violation requires the employee to prove that the FMLA violation was the proximate cause of his damages.  *Id.* at 35-36.  The court found that Breeden's harm—her 2008 termination—was too far removed from the alleged retaliation—the 2005 realignment—with too

---

[2] Under Rule 50(b), within "28 days after the entry of judgment," a party whose earlier motion for judgment as a matter of law under Rule 50(a) was not granted "may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59."  Fed R. Civ. P. 50(b).

9

many intervening causes for the alleged retaliation to be the proximate cause of her termination. *Id.* at 36-37. On June 1, 2010, Breeden appealed both the judgment as a matter of law and the district court's February 16, 2010 grant of summary judgment to Novartis on her FMLA interference claim.

### B. Mixed-Motive Cross-Appeal

In its conditional cross-appeal, Novartis argues the district court erred by instructing the jury that it could find in favor of Breeden on a mixed-motive theory of liability.[3] Novartis

---

[3] The mixed-motive language appears in Title VII of the Civil Rights Act of 1964, as amended, providing that an employment discrimination plaintiff must establish that discrimination was only "*a* motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added); *see Ginger v. District of Columbia*, 527 F.3d 1340, 1345 (D.C. Cir. 2008), *cert. denied*, 129 S. Ct. 930 (2009). If a plaintiff alleges that discrimination was one of multiple "motivating factor[s]" in his employer's decisionmaking process, the plaintiff is said to have a "mixed-motive" claim. *See Ginger*, 527 F.3d at 1345. In contrast to Title VII, the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.*, does not permit mixed-motive claims against a private employer and requires a plaintiff to "prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2352 (2009). The Supreme Court has not addressed the viability of a mixed-motive claim under the FMLA, nor has this court.

Novartis moved *in limine* to preclude Breeden from arguing a mixed-motive theory at trial but the district court held the motion in abeyance until jury instructions. Mot. in limine on Mixed Motive, *Breeden II*, 714 F. Supp. 2d 33 (No. 1:08-CV-00625 Feb. 9, 2010). Ultimately, the court allowed Breeden's counsel to argue a mixed-motive theory to the jury and the district court instructed the jury that Breeden need only establish that her taking FMLA leave was "a

10

contends that the FMLA, like the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.*, does not permit mixed-motive claims but requires a plaintiff to prove but-for causation. Because Novartis prevailed in the district court, its cross-appeal is conditional only, meaning we need not reach it if we affirm the district court on Breeden's appeal.

**II.**

Breeden claims that Novartis interfered with her FMLA rights by failing to restore her to an equivalent position when she returned from FMLA leave in 2005 and that Novartis retaliated against her for taking FMLA leave by giving her smaller, less prestigious accounts in the 2005 realignment and by refusing to reassign her to her old accounts. We address her claims in turn.

**A. Interference Claim**

We review de novo the district court's grant of summary judgment to Novartis on Breeden's interference claim. *Sigmund v. Starwood Urban Retail VI, LLC*, 617 F.3d 512, 513 (D.C. Cir. 2010). We view the evidence in the light most favorable to Breeden and affirm if " 'there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.' " *Id.* at 513-14 (ellipsis in original) (quoting Fed. R. Civ. P. 56(c)).

The FMLA entitles an eligible employee, upon return from FMLA leave, "to be restored . . . to the position of employment held . . . when the leave commenced; or to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment," 29 U.S.C. § 2614(a)(1), and prohibits an employer from "interfer[ing]

---

motivating factor" in Novartis's decision to realign her accounts in 2005.

11

with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise" FMLA rights, *id.* § 2615(a)(1). Breeden claims Novartis interfered with her FMLA rights by not restoring her to an equivalent position when she returned from FMLA leave in July 2005. The district court appears to have assumed, as Breeden argues here, that Breeden was entitled to be restored to a position equivalent to the one she held in 2004 rather than to the one she held in March 2005 when she began FMLA leave. *See Breeden I*, 684 F. Supp. 2d at 60-61. Although we are not convinced that is the correct comparison, because the issue has not been joined before us and because we believe Breeden's post-FMLA leave position was equivalent to her 2004 position, we can affirm the district court assuming without deciding that it compared the correct positions.

Department of Labor regulations clarify what constitutes an equivalent position. "An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." 29 C.F.R. § 825.215(a). The equivalency analysis does not, however, encompass "de minimis, intangible, or unmeasurable aspects of the job." *Id.* § 825.215(f). Breeden acknowledges that she retained the same title and benefits when she returned from FMLA leave and that her compensation increased. She argues nonetheless "that her territory was so drastically cut that her status, her responsibilities, her authority, her level of effort, her job security, and her chances of promotion were all severely and measurably diminished." Appellant's Br. 52-53.[4]

---

[4] Breeden urges us to define "status" as used in 29 C.F.R. § 825.215(a) in conformity with Department of Labor regulations

12

Breeden first alleges that her post-realignment territory contained "many accounts that were closed doors" because the formularies used by those accounts locked them into using products made by Novartis's competitors.[5]  *Id.* at 53.  Despite her allegation that "many" accounts were closed doors she identifies only one—the University of Virginia.  If the formulary in fact "closed doors" on Breeden, it did so only temporarily, as evidenced by the fact that Breeden eventually convinced the University of Virginia to add a Novartis product to its formulary.  Breeden Decl. ¶ 14; *see also* Breeden Dep. 115 ("They were not permanent contracts, . . . they were yearly contracts, so the goal was to get in there and change that . . . .");  *id.* at 115-16 (Breeden "could readdress [account with formulary using competitor's products] in a year").  Moreover, Sneith testified that an account's use of a formulary did not turn the account into a closed door.  *See* Sneith Dep. 49 (use of competitor's products on formulary does "not necessarily" mean Novartis products are "not allowed to be on the formulary").  Sneith explained that one of her accounts had a contract with a competitor but that a nephrologist at the account preferred Novartis products.  The nephrologist used the competitor's products during inpatient treatment but switched the patient to Novartis products when he discharged the patient for outpatient treatment.  *Id.* at 50-51.  "So long-term, that patient was going to be on [Novartis] products, but for that four-day window of

interpreting "status" under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4313(a)(2)(A)-(B), (a)(3)(A)-(B).  *See* 69 Fed. Reg. 56,266, 56,275 (2004).  Section 825.215 defines status precisely enough for us to conclude that Novartis restored Breeden to an equivalent position without resort to regulations promulgated under a different statute.

[5] "A formulary is essentially a list of prescription drugs preferred by a particular health care provider or plan."  Appellee's Br. 9 n.4.

13

time when they were in the hospital, they were on the competitor's products. So in that case what the hospital did inpatient didn't really reflect what was going to happen moving forward." *Id.* at 51. The record therefore does not support Breeden's assertion that the formulary closed doors at many of her accounts.

Breeden's next argument, which seems to contradict her first, claims that her post-realignment accounts required less skill than her pre-realignment accounts "because there were fewer decision-makers and fewer bureaucratic hoops to jump through." Appellant's Br. 54. She also argues her new accounts required less effort "because she spent significantly less time traveling [in her car] to her new accounts." *Id.* at 55. But the number of "bureaucratic hoops" Breeden had to "jump through" at each account is precisely the type of "intangible[] or unmeasurable aspect[]" that we do not consider in assessing the equivalency of positions. 29 C.F.R. § 825.215(f). Additionally, that she spent fewer hours in her car after the realignment, although a measurable aspect of the realignment, does not make her post-realignment position non-equivalent to her pre-realignment position. *See Smith v. E. Baton Rouge Parish Sch. Bd.*, 453 F.3d 650, 652 (5th Cir. 2006) (fact that plaintiff no longer had to travel in new position was de minimis, intangible difference). Breeden's job was selling medical products, not driving cars.

Finally, Breeden argues that she enjoyed fewer opportunities to advance her career after the realignment because a TAM needed large accounts like the University of Maryland and Johns Hopkins to receive a promotion. Breeden, however, was hardly a rising star before the 2005 realignment. She had consistently ranked last or next-to-last among sales representatives in the TBU and had received a "below expectations" rating in her sales evaluation. After the realignment, by contrast, Breeden ranked 14th out of 25 sales

14

representatives in 2005—despite being on leave from March to July. In 2006 she rose further to rank 7th out of 25. While Breeden's improved ranking may have resulted partly from the reduced expectations and sales goals that accompanied her smaller account portfolio, that does not alter the fact that she achieved substantial success after the 2005 realignment—success she had failed to attain while servicing larger accounts before the 2005 realignment. Drawing all reasonable inferences in Breeden's favor, we do not believe a reasonable juror could conclude that Breeden's prospects for career advancement were greater before the 2005 realignment—when she was among the least productive TAMs but serviced some of Novartis's largest accounts—than they were after the realignment—when she was among the most productive TAMs while servicing smaller accounts. To the contrary, common sense tells us that a salesman who fails to sell to his employer's largest clients will not long hold his job, much less receive a promotion. *Cf. Csicsmann v. Sallada*, 211 F. App'x 163, 166 n.3 (4th Cir. 2006) (rejecting plaintiff's argument "that the new position was ultimately slated for layoff while the pre-leave position was not" because "[t]here [was] nothing in the record to support his theory that the pre-leave position would have survived").

The Fourth Circuit, reviewing similar facts, held that a plaintiff's FMLA interference claim was properly dismissed for failure to state a claim on which relief could be granted. *Montgomery v. Maryland*, 266 F.3d 334, 341-42 (4th Cir. 2001), *judgment vacated on other ground*, 535 U.S. 1075 (2002); *see Montgomery v. Maryland*, 72 F. App'x 17, 19-20 (4th Cir. 2003) (reaffirming reasoning and holding on FMLA interference claim). The plaintiff had worked as an administrative aide to the warden of Maryland's Eastern Correctional Institute but, upon returning from FMLA leave, was reassigned to a position as a secretary in the maintenance department. 266 F.3d at 336. She retained the same salary and benefits but argued her new

15

position was not equivalent to her old position because her former duties had been "truly administrative" whereas her new position required her to perform the "most menial of clerical functions." *Id.* at 341. Additionally, she had her own work area in her old position but shared a room with another employee in her new position. *Id.* The court rejected the plaintiff's argument that the two positions were not equivalent, finding that her "complaint focuse[d] on precisely the sorts of de minimis, intangible, and unmeasurable aspects of a job that the regulations specifically exclude." *Id.* The court explained further that "the alleged reduction in the complexity of her tasks and the sharing of work space [fell] within the excluded de minimis category." *Id.* at 342. The difference between the "truly administrative" tasks she used to perform and the more menial tasks she performed in her new position was "not of sufficient magnitude, especially given the equivalent pay grade . . . , to constitute an FMLA violation." *Id.*; *see also Smith*, 453 F.3d at 652 (positions equivalent where plaintiff retained same salary and similar title and job description); *Mitchell v. Dutchmen Mfg.*, 389 F.3d 746, 749 (7th Cir. 2004) (positions equivalent where plaintiff retained same salary and benefits but was required to perform additional tasks that "were neither overly time consuming nor physically demanding"); *Csicsmann*, 211 F. App'x at 166 (positions equivalent where "salary, title, bonus eligibility, health care, and retirement benefits remained unchanged" despite plaintiff's allegation "that the new position was less prestigious and less visible"); *Lampley v. IMS Mgmt. Servs., LLC*, No. 10-11543, 2011 WL 914311, at *2 (11th Cir. Mar. 17, 2011) (unpublished) (positions equivalent where plaintiff retained same title, pay and benefits despite changed work location). As in *Montgomery*, Breeden's allegations "focus[] on precisely the sorts of de minimis, intangible, and unmeasurable aspects of a job that the regulations specifically exclude." *Montgomery*, 266 F.3d at 341. And, again as in *Montgomery*, Breeden's salary was not "interfere[d]" with.

16

Accordingly, we affirm the district court's grant of summary judgment to Novartis on Breeden's interference claim.

**B. Retaliation Claim**

The district court granted judgment as a matter of law to Novartis on Breeden's retaliation claim because it concluded that Breeden had failed to establish that Novartis's alleged retaliation in 2005 proximately caused her termination in 2008. We review de novo the district court's grant of judgment as a matter of law and "may affirm only if we find . . . that no reasonable jury could [have reached] a verdict in the plaintiff's favor." *Conseil Alain Aboudaram, S.A. v. de Groote*, 460 F.3d 46, 50 (D.C. Cir. 2006) (internal quotation marks omitted) (ellipsis and alteration in original). Although judgment as a matter of law is "highly disfavored" because it "intrudes upon the rightful province of the jury," *Boodoo v. Cary*, 21 F.3d 1157, 1161 (D.C. Cir. 1994), it is proper if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for" the nonmoving party, Fed. R. Civ. P. 50(a)(1). *See Boodoo*, 21 F.3d at 1161 (judgment as matter of law proper if plaintiff failed to proffer sufficient evidence of proximate causation); *see also Guile v. United States*, 422 F.3d 221, 228 (5th Cir. 2005) (affirming grant of judgment as matter of law because plaintiff failed to establish proximate cause). The questions before us, then, are whether the FMLA requires a plaintiff with a retaliation claim to establish proximate causation and, if so, whether Breeden presented evidence sufficient to permit a reasonable jury to conclude that the 2005 realignment proximately caused her termination three years later, in 2008.

An employer who violates the FMLA is liable "for damages equal to the amount of any wages, salary, employment benefits, or other compensation denied or lost . . . by reason of the violation; or . . . any actual monetary losses sustained . . . as a direct result of the violation." 29 U.S.C. § 2617(a)(1)(A)(i)(I)-(II). Breeden does not dispute that the district court's jury

17

instructions "properly state[d] the law as set forth in the FMLA" and "incorporate[d] the concept of proximate cause by requiring that Breeden prove that she sustained monetary losses *as a direct result of* Novartis'[s] retaliation." Appellant's Br. 31 (emphasis in original). The parties thus agree that Breeden had to establish proximate causation. We may therefore assume without deciding that an FMLA retaliation plaintiff must establish proximate causation.

We next ask whether Breeden presented sufficient evidence to establish proximate causation. In determining proximate causation, we ask: "Was there an unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury?" *Hicks v. United States*, 511 F.2d 407, 420 (D.C. Cir. 1975) (quoting *Milwaukee & St. Paul Ry. Co. v. Kellogg*, 94 U.S. 469, 474-75 (1896)).[6] The district court correctly concluded that there was no continuous succession of events between the 2005 realignment and Breeden's termination. *Breeden II*, 714 F. Supp. 2d at 36-37. Rather, there were several "new and independent cause[s] intervening between" 2005 and

---

[6] The Restatement (Second) of Torts (1965) § 433 identifies three considerations in determining proximate cause: "[1] the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it; [2] whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; [3] lapse of time." *See also* W. Page Keeton *et al.*, *Prosser and Keeton on The Law of Torts*, § 41, at 264 (5th ed. 1984) ("[L]egal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability.").

18

2008.  Novartis hired Leal to replace O'Callaghan as head of the
TBU in May 2006.  Leal hired a new outside consultant, Powell
& Associates, to recommend changes to the TBU.  That
consultant recommended creating a new sales area in the
Midwest.  Because Novartis believed it could not afford to hire
another TAM, the recommendation was to combine Breeden's
and Sneith's sales areas.  In combining non-TBU sales territories
in the past, Novartis had developed rules "on how to combine
territories and how [to] choose who is the . . . surviving
associate."    3/2/10  Tr.  (afternoon)  8-9  (Barr testimony).
Pursuant to those rules, Novartis decided to retain Sneith to
service the combined sales area.  Only then—after each of the
foregoing intervening events—did Novartis terminate Breeden.

Breeden attempts to downplay the significance of the
intervening events by arguing that her immediate supervisor,
Harper, was a "direct and consistent link" between the alleged
retaliation in 2005 and her 2008 termination.  Appellant's Br.
34.  Breeden claims Harper promised to make her "whole" by
reassigning her to the accounts she serviced in 2003-2004 but
ultimately reneged on that promise in retaliation for her FMLA
leave.  *Id.* at 35.  She further claims that Harper could have
prevented her termination in 2008 and that he was most
responsible for choosing to let her go rather than Sneith.  The
record, however, does not support her assertions.  Harper
testified that he lacked the authority to rearrange Breeden's
accounts in 2005, *see* 3/2/10 Tr. (morning) 33-34 (testimony of
Harper that he referred Breeden's request to his boss, who
"wasn't particularly interested in moving accounts around");
Harper Decl. ¶ 11 ("[A]fter [the 2005] realignment, I had no
ability or authority to transfer or assign accounts within my sales
area or outside my sales area . . . ."), and Breeden acknowledged
as much in her deposition, *see* Breeden Dep. 136-37 (Harper
told Breeden that "he would present [her request] to his
management, and they would work as a team to fix it").
Additionally, Breeden offered no evidence that Harper played a

19

role in the decision to terminate her. The evidence instead indicates that Barr and John Weinberg, the TBU's executive director of sales and marketing, not Harper, made the decision. *See* 3/2/10 Tr. (afternoon) at 19-20 (testimony of Harper that he was "just told to get [Breeden] on the phone" and that he called her for Barr); *id.* at 8-9 (testimony of Barr that he applied rules in determining to terminate Breeden); Am. Compl. ¶¶ 102-03 (Harper called Breeden to connect her to Barr, who "informed Breeden that 'outside consultants' had decided to eliminate her territory"); Leal Aff. ¶¶ 5-6 (Weinberg applied rules in deciding to retain Sneith); Weinberg Decl. ¶¶ 6-7 (same). That Harper was responsible for filling the open position in the new Indiana/Cincinnati sales area, moreover, does not relate back to Novartis's decision to terminate Breeden nor is there any evidence that Harper's decision not to consider Breeden for the position was in retaliation for Breeden's taking FMLA leave almost three years earlier. The sales representative Novartis hired for the position had existing relationships with accounts in the new territory—an important qualification that Breeden lacked irrespective of the 2005 realignment.

Breeden further argues the intervening events were not a new and independent cause of her termination because the 2005 realignment made her termination inevitable. She claims that a TBU salesman can attain success and job security only by servicing large, prestigious accounts and that, because she serviced smaller, less prestigious accounts after the 2005 realignment, her career was doomed. Breeden attempts to bolster her argument by claiming that TBU managers reached their positions "by capitalizing on their performance at large transplant centers" like the ones she serviced before 2005 and by noting that Novartis filled the new position created by the 2008 realignment with a salesman who had, in Breeden's words, "important relationships with the major transplant centers" in the newly created area. Appellant's Br. 41-43. She asserts that she "would have been able to maintain [connections] at Hopkins

20

and [University of Maryland] had it not been for" the 2005 realignment and that her "lack of connections at large prestigious transplant centers" was the "final straw" that led to her termination. *Id.* at 43-44.

Breeden's argument is flawed because the evidence does not establish that simply servicing large accounts guarantees success or job security. Instead it reflects that *successfully* servicing large accounts enhances a sales associate's career prospects and job security. *See* 3/1/10 Tr. at 75 (testimony of Breeden that "people that *succeeded* had these large accounts" such as "Harper, who had *done great* in Ohio" (emphases added)); *id.* at 77 (Breeden testimony) ("If you can get into a large account and *have success*, it's noted by everybody, and from that you're going to be obviously able to work your way up." (emphasis added)). Breeden's managers did not attain their positions because they serviced large accounts but because they *successfully* serviced large accounts, *see, e.g.*, 3/3/10 Tr. at 27-28 (testimony of John Blutfield, head of TBU's commercial operations from approximately 2005-2006, that Harper and another TBU manager had "legendary relationships" and "a track record of success" with large accounts)—something Breeden was never able to do. That some of the TBU's best sales associates, through "legendary" relationships with its largest accounts, achieved success says nothing about Breeden's career prospects before the 2005 realignment.

Simply put, Breeden adduced no evidence to establish that, had her accounts not been realigned, she would have established and maintained successful relationships with the accounts she serviced before 2005. Accordingly, there is no basis upon which a reasonable jury could conclude that Breeden's career prospects or job security diminished after the 2005 realignment. The evidence, in fact, suggests the contrary. Before the 2005 realignment, she was the last or next-to-last ranked sales associate and received a "below expectations" rating in her 2003

21

performance review despite the fact that she serviced large, prestigious accounts. She did not achieve success until after the 2005 realignment when she began to service smaller accounts. Not only did her sales rank improve significantly but she also received—jointly with her colleagues in her business area—a sales award at a national conference in 2006 and her compensation increased. These are hardly the signs of a career in decline or of an employee whose termination is inevitable. To the contrary, Breeden's career seems to have been on the rise after 2005.

We agree with the district court that no reasonable jury, relying on the evidence presented at trial, could conclude that the 2005 realignment proximately caused Breeden's termination in 2008. We therefore affirm the district court's grant of judgment as a matter of law to Novartis on Breeden's retaliation claim.

### C. Equitable Relief

An employer who violates the FMLA is liable not only for money damages but also "for such equitable relief as may be appropriate, including employment, reinstatement, and promotion." 29 U.S.C. § 2617(a)(1)(B). Breeden claims the jury found that Novartis violated the FMLA by retaliating against her for taking FMLA leave and that the district court's subsequent judgment as a matter of law did not disturb that finding. She raises this argument for the first time on appeal, however, and it is accordingly forfeited. *See Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 21-22 (D.C. Cir. 2010). In response to Novartis's motion for judgment as a matter of law, Breeden had the opportunity to argue that she was entitled to equitable relief even if the district court found that she suffered no monetary damages and granted Novartis's motion but she failed to do so.

22

Even if the argument were not forfeited, however, we would reject it. The district court instructed the jury that Breeden had to prove four elements "to prevail on her claim of intentional retaliation"—one of which was that she "lost compensation or benefits by reason of Novartis'[s] alleged adverse action, or sustained other monetary losses as a direct result of the alleged adverse action." 3/3/10 Tr. 84. The district court granted judgment as a matter of law to Novartis because it found that Novartis's "alleged adverse action"—the 2005 realignment—did not proximately cause Breeden's 2008 termination. *Breeden II*, 714 F. Supp. 2d at 35-37. The district court thus held that Breeden failed to present sufficient evidence to establish an element necessary to her retaliation claim. In other words, the court held that no FMLA violation occurred. As explained *supra*, we affirm the district court's holding that Novartis did not violate the FMLA. Accordingly, Breeden is not entitled to equitable—or any other—relief.[7]

---

[7] The cases on which Breeden relies to argue she is entitled to appropriate equitable relief are easily distinguished. She relies most heavily on *Colburn v. Parker Hannifin/Nichols Portland Division*, 429 F.3d 325 (1st Cir. 2005), but that case says only that a "hypothetical plaintiff who succeeds in establishing a *retaliatory firing* claim would no doubt have been 'prejudiced by the violation' and would thus be theoretically entitled to the full array of remedies provided by the statute." *Id.* at 335 n.6 (emphasis added); *see also Traxler v. Multnomah Cnty.*, 596 F.3d 1007, 1010 (9th Cir. 2010) (employee demoted to lower-paying position and then fired for taking FMLA leave entitled to both monetary and equitable remedies); *Miller v. AT&T*, 83 F. Supp. 2d 700, 701-09 (S.D.W. Va. 2000) (employee fired in violation of FMLA); *Rogers v. AC Humko Corp.*, 56 F. Supp. 2d 972, 974 (W.D. Tenn. 1999) (employee fired in retaliation for taking FMLA leave). Breeden, by contrast, does not clear the first hurdle—that of "establishing a retaliatory firing." *Colburn*, 429 F.3d at 335 n.6.

23

## III.

For the foregoing reasons, we affirm the district court's grant of summary judgment to Novartis on Breeden's interference claim and its grant of judgment as a matter of law to Novartis on Breeden's retaliation claim.[8]

*So ordered.*

---

[8] Because we affirm the district court on Breeden's appeal, we do not reach Novartis's conditional cross-appeal regarding the viability of a mixed-motive claim under the FMLA.

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES, AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 28 and Local Rules 26.1 and 28(a)(1), Plaintiff/Appellant Mary Kate Breeden makes the following disclosures and certifications.

## A. PARTIES AND AMICI

The parties in the District Court were Plaintiff Mary Kate Breeden and Defendant Novartis Pharmaceuticals Corporation. There were no intervenors or *amicus curiae* below.  On this appeal, the following parties have indicated they will appear as *amicus curiae*: National Partnership for Women & Families, The Public Justice Center, Equal Rights Advocates, and the National Employment Lawyers Association, American Association of Retired Persons, and the Secretary of Labor.

## B. RULINGS UNDER REVIEW

The rulings under review are a summary judgment by the District Court, the Honorable James Robertson, judge presiding, entered on February 16, 2010, judgment notwithstanding the verdict entered on May 26, 2010, and the opinion issued by the U.S. Court of Appeal for the District of Columbia Circuit on July 8, 2011.

## C. RELATED CASES

There are no related cases.

## D. CORPORATE DISCLOSURE STATEMENT

Mary Kate Breeden is an individual and not affiliated with any publicly held corporation.


/s/ Adam Augustine Carter


*Counsel for Appellant Mary Kate Breeden*